# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

ALAIN ARMAND, )
)
   Petitioner, )
)
  v. )   No. 4:24-CV-974 HEA
)
PRISCILLA MOXAM ARMAND, )
)
   Respondent. )

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Alain Armand's Verified Petition for Return of Children to France, which was filed against Respondent Priscilla Moxam Armand pursuant to the 1980 Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 9001 *et seq.*[1] Petitioner alleges Respondent removed their children from France without his consent, and that she is unlawfully retaining them in the United States. He seeks an order from the Court directing the children be returned to France, which he claims is their habitual residence. Respondent opposes returning the children. After

---

[1] Both Petitioner Alain Armand and Respondent Priscilla Moxam Armand are proceeding in this matter *pro se* without the assistance of counsel. Respondent is an attorney licensed to practice law by the State of Florida. Respondent is appearing personally on behalf of herself. She is not admitted to practice in the United States District Court for the Eastern District of Missouri. Petitioner has a law degree from Howard University but is not a licensed attorney.

consideration of the pleadings, testimony, exhibits, and briefing submitted by the parties, the Court will grant Petitioner's Verified Petition.

## I. Introduction

The Hague Convention was adopted to address the problem of international child abductions that resulted from domestic disputes. *Golan v. Saada*, 596 U.S. 666, 670 (2022). It provides authority for the physical return of a child who has been wrongfully removed or retained from their habitual residence in violation of a parent's custodial rights. *Id.* "It is the [Hague] Convention's core premise that 'the interests of children ... in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (quoting Hague Convention Preamble). "To that end, the [Hague] Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which [he or ]she habitually resides." *Id.* (citing Hague Convention art. 12). "The removal or retention is wrongful if done in violation of the custody laws of the child's habitual residence." *Id.*

Importantly, a Hague Convention case is not a child custody case. "The Hague Convention is not designed to resolve underlying custody disputes, but rather to ensure that such disputes are adjudicated in the appropriate jurisdiction." *Acosta*

*v. Acosta*, 725 F.3d 868, 875 (8th Cir. 2013) (internal citations omitted). "Its 'primary purpose is to restore the *status quo* and deter parents from crossing international borders in search of a more sympathetic court.'" *Id.* (quoting *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 376 (8th Cir. 1995)).  The Hague Convention is limited to the issue of whether a child should be returned to his or her country of habitual residence to enable the courts of that country to determine issues of custody.

## II. Procedural Background

Petitioner Alain Armand, a citizen of the United States and the father of minor children A.A. and A.J.A., filed his Verified Petition on July 15, 2024.  (ECF No. 1). Petitioner alleges that on or around April 4, 2024, his wife and A.A. and A.J.A.'s mother, Respondent Priscilla Moxam Armand, who is also a United States citizen, wrongfully removed the children from France and has retained them in Missouri since that date without his consent.  Petitioner claims the children's place of habitual residence immediately prior to their removal was France, and at the time of their removal, Petitioner was exercising his custody rights under French law.  Petitioner requests that the Court enter an order returning A.A. and A.J.A. to France.

On October 2, 2024, Respondent filed an Answer, in which she denies that the children's habitual residence was France.  (ECF No. 9 at 3, ¶ 10).  In her Answer, she also asserts an affirmative defense.  Respondent claims that returning the

children to France would present a grave risk of physical and/or psychological harm to A.A. and A.J.A. or otherwise would place them in danger.

The parties have submitted pre-hearing briefs, witness lists, and exhibit lists.[2] On April 21, 2025, the parties appeared before the Court for an evidentiary hearing. Respondent appeared in person.  Finding compelling circumstances and for good cause shown, the Court allowed Petitioner to remain in France and testify by contemporaneous transmission via a Zoom teleconference arranged by the Court. *See* Fed. R. Civ. P. 43(a).  Petitioner and Respondent testified under oath, and both parties offered exhibits into evidence.  Aside from the parties themselves, no other witness testified.  After careful consideration of the parties' court filings and all credible evidence presented, the Court makes the following findings of fact and conclusions of law.

---

[2]In an Order dated March 12, 2025, the Court ordered that each party was to file a pre-hearing brief by April 9, 2025, and a list of witnesses by April 11, 2025. (ECF No. 27). Petitioner timely complied with these deadlines, however, as of April 14, 2025, Respondent had not filed either a pre-hearing brief or her witness list, and the Court ordered Respondent to show cause in writing no later than April 17, 2025, why she failed to comply with these deadlines. (ECF No. 32). On April 16, 2025, Respondent filed a response to the Order to Show Cause in which she stated that she is not accustomed to the email notifications used by this District for CM/ECF filings, and she did not understand that she was required to click on the document number in the email to view the Court's entire order.  According to Respondent, she saw that the Court had set a hearing but not the filing deadlines. In her response, Respondent affirms her intent to comply with the Court orders in the future.  (ECF No. 37). That same day, Respondent also filed, without leave of Court, her pre-hearing brief and witness list.  As an attorney and party to this suit, Respondent should have familiarized herself with the Court's CM/ECF Procedures Manual, which is available on the Court's webpage. However, in the interest of justice the Court will lift the show cause order and allow Respondent to file her pre-hearing brief and witness list out of time.

### III. Findings of Fact

Petitioner and Respondent were married in December 2009 in Fort Lauderdale, Florida. Two children were born of the union. A.A., who is 14, was born in August 2010 in Florida, and A.J.A., who is 12, was born in October 2012 in Haiti. Both children are United States citizens. Petitioner testified that he has initiated divorce proceedings in France, but the couple remains married. There was no evidence presented that there has been any order entered against either parent regarding custody of the two children.

Respondent and the two children initially moved to France in 2016 when she was admitted into a master's degree program at the American University of Paris. Petitioner later joined the family, and they settled in an apartment in Noisy-Le-Sec. The family initially lived in France from 2016 until August 2019. The children are proficient in French, and during this time, they were enrolled in a local school for approximately three school years. During this time period, Respondent traveled to Oxford, England and The Hague, Netherlands for her studies and to the United States for work. When Respondent was traveling, the children remained with Petitioner in France. Neither Petitioner nor Respondent have family in France, although Petitioner, Respondent, and the two children did travel to Florida, Jamacia, and Haiti for family visits.

Between August 2019 and October 2020, the family returned to the United States for approximately 14 months.  They lived in an apartment in Fort Myers, Florida.  The family returned to France in October 2020 and rented a house in the village of Auffargis.  The children were again enrolled in local schools, where they attended from October 2020 through April 3, 2024.  The children performed well and achieved high marks.  They also participated in a number of extracurricular activities.  A.A. played tennis, participated in theater, and took piano and jujitsu lessons.  A.J.A. played soccer, tennis, and took violin lessons.  The children had friends in their neighborhood, rode bikes, went to birthday parties, and had sleepovers.

From at least 2016 to April 2024, Respondent was the sole income earner in the family.  She worked remotely as an attorney for firms and businesses in the United States.  Petitioner described himself as a stay-at-home dad.  He took care of the children, which included walking them to school, coaching A.J.A.'s soccer team, going on field trips, making some meals, and doing some of the laundry.  The family had a car in France, and they received care from French medical doctors.[3]

In March 2022, Respondent started a job with an American company doing insurance litigation defense.  Respondent worked remotely in France, and due to the

---

[3]There was testimony that at one point Petitioner sought care from a doctor in Spain.

time difference, Respondent worked from 2:00 p.m. through 2:00 a.m.  Respondent testified that she was often exhausted, and sometime in late 2023, she had a health incident and experienced vertigo.  Respondent was treated in a hospital in France where she was told that she has Ménière's disease.  Respondent resigned from her job in November 2023.  She testified that Petitioner was very upset that she had resigned.  Respondent looked for new work in and out of her field but was unable to secure either a job in France or a position where she could work remotely.  By March 2024, the family was running out of money.  They were behind in rent and accepted food from a food bank.  There was also evidence that the family received financial assistance for the children from the government of France.

On April 3, 2024, Respondent borrowed money from her sister-in-law, and without Petitioner's knowledge, she purchased three plane tickets to the United States for the next day.  Respondent did not tell Petitioner that she was leaving with the children and, in fact, when she was confronted about packing, Respondent lied and told Petitioner that she was organizing and packing up clothes that did not fit the children in case the family was evicted and had to move quickly.  While Respondent was having a difficult time finding a job in France, and there were discussions between Respondent and Petitioner about her returning to the United States to obtain

work, there was no agreement between Petitioner and Respondent that Respondent could return to the United States with the children.

Respondent left with A.A. and A.J.A. and flew to the United States on April 4, 2024. She did not inform Petitioner that she was leaving with the children until after the plane was in air. Respondent told Petitioner that the children were in Missouri on April 5, 2024. Respondent did not respond to Petitioner's text messages in which he inquired about their return date. On April 17, 2024, Petitioner lodged an official complaint with the French police stating that the children had been kidnapped, and on July 15, 2024, Petitioner filed the above-captioned cause of action seeking return of the children to France.

During Petitioner's and Respondent's time together in France, the couple's marriage deteriorated, and they were sleeping in separate rooms. Respondent characterized her living situation in Auffargis as "a house of horrors." She testified that Petitioner would berate her, and that he would yell and scream and call her names in front of the children. She described one incident in March 2024, when Petitioner slapped her phone out of her hand and in the process, he struck her on the face. Respondent called the police, but according to Respondent, due to the fact that she did not have any physical marks, they took no action, and Petitioner was not arrested. The police did suggest that Respondent file an official complaint for abuse,

but there is no evidence that she ever did.  Respondent submitted no other evidence of physical abuse towards her.

As for Petitioner's conduct toward the children, Respondent testified that Petitioner has a domineering parenting style, and that he has hit the children over the head with a wooden spoon as discipline for eating with their mouths open.  On one occasion, Petitioner shoved a melon into A.A.'s mouth.  Respondent presented no other evidence of alleged physical abuse by Petitioner directed at the children.  As for alleged psychological abuse, Respondent testified that Petitioner told A.A. that her face looks like a star map due to her acne, and when A.A. expressed that she no longer wanted to attend jujitsu class because the teachers and other students were adults and she did not feel comfortable, Petitioner screamed at her and attempted to force her to go.

Petitioner and Respondent have different parenting ideas about the children's diet.  Petitioner wanted to children to follow a strict gluten-free, vegan diet.  He fed the children a "Heavy Metal Detox Smoothie" for breakfast, which contained bananas, blueberry powder, cilantro, barley grass powder, algae, seaweed, orange juice, and coconut water.  He also served the children celery juice.  Respondent contends that the children would go to school hungry, but she does not claim that Petitioner otherwise did not feed the children or that they were malnourished.

9

Respondent and the two children have lived in Missouri since leaving France on April 4, 2024.  They are living with Respondent's sister.  Respondent is working, and the children are enrolled in school, where they are doing well.

Both Petitioner and Respondent have visas that allow them to live in France. Petitioner testified that he has a French visa that expires in October 2026.  He also testified that he now has a job at a hotel, and that currently he is living rent-free with a neighbor.  According to Petitioner, upon the children's return to France, they could live in the house with the neighbor, or with income from his new job, he would be able to rent a place to live.

## IV.  Conclusions of Law

The United States Congress implemented the Hague Convention through ICARA.[4] 22 U.S.C. §§ 9001 *et seq.*  ICARA permits a parent seeking relief under the Hague Convention to file a petition in federal court for return of a child under the age of 16. *Golan*, 596 U.S. at 671. "Under ICARA, the party petitioning for the child's return bears the burden of establishing by a preponderance of the evidence that the child was wrongfully removed or retained." *Id.* at 671–72 (citing § 9003(e)(1)).

---

[4]France is a signatory to the Hague Convention as of July 1, 1988. *See* https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited Apr. 28, 2025).

To establish a *prima facie* case for return of a child, a petitioner must show that: "(1) immediately prior to removal or retention, the child habitually resided in another Contracting State; (2) the removal or retention was in breach of the petitioner's custody rights under the State's law; and (3) the petitioner was exercising those custody rights at the time of the removal or wrongful retention." *Custodio v. Samillan*, 842 F.3d 1084, 1088 (8th Cir. 2016) (quotations omitted).  If a petitioner establishes a *prima facie* case, the child must be "promptly returned unless one of the narrow exceptions set forth in the [Hague] Convention applies." *Id.* at 1089. "Absent a finding that an exception applies, a child determined to be wrongfully removed or retained must be 'promptly returned' to the child's country of habitual residence." *Golan*, 596 U.S. at 672 (quoting 22 U.S.C. § 9001(a)(4)).

## A. Petitioner's *Prima Facie* Case for Return

Petitioner argues that he has satisfied all three elements of a *prima facie* case for return under the Hague Convention because he demonstrated that: (1) France was A.A.'s and A.J.A.'s country of habitual residence immediately prior to their removal; (2) the removal of the two children to the United States breached his custody rights; and (3) he was exercising those custody rights at the time of their removal.

Respondent offered no evidence to dispute the fact that Petitioner has custodial rights and was exercising those rights at the time she removed the two

children from France to the United States.  It is undisputed that Petitioner is the A.A.'s and A.J.A.'s father, and although Petitioner has since initiated divorce proceedings in France, the couple remains married.  Further, while in France, the family was living together in one residence and had been for at least three years.  It is also undisputed that Petitioner did not consent to the children's removal from France, and he objects to them remaining in the United States.  In short, the second and third elements of the *prima facie* case are not in dispute.

As for the children's habitual residence, Respondent introduced evidence that A.A. and A.J.A. are living in Chesterfield, Missouri, and that they are doing well in school.  But the issue before the Court is not what is the children's current residence, but rather where they habitually resided *immediately prior* to their removal from France on April 4, 2024.  *Custodio*, 842 F.3d at 1088.

The term habitual residence is not defined by the Hague Convention. The Supreme Court has instructed that "a child resides where he or she lives," and "residence in a particular country can be deemed 'habitual,' [ ] only when [the child's] resident there is more than transitory." *Monasky*, 589 U.S. at 76. The term refers to the place where the child has "some degree of integration . . . in a social and family environment" and "the place where a child is at home, at the time of removal or retention . . ." *Id.*  The determination of a child's habitual residence is a "fact-

12

driven inquiry" and "depends on the totality of the circumstances specific to the case." *Id.* at 71, 78.

For older children, who are "capable of acclimating to their surroundings," courts are to consider factors that would indicate acclimatization, which may include the following: "immigration status of child and parent, academic activities, social engagements, participation in sports programs and excursions, meaningful connections with the people and places in the child's new country, language proficiency, and location of personal belongings." *Id*. at 78 n.3 (internal quotation marks omitted). The intention of the parents is also one of the relevant factors to consider, but "[n]o single fact ... is dispositive across all cases." *Id.* at 79.

The Court finds that Petitioner has established that France was the habitual residence of A.A. and A.J.A. immediately prior to their removal from France on April 4, 2024. Prior to their removal, A.A. and A.J.A. had been living in France continually for more than three years and had lived there almost seven out of the eight prior years. While Petitioner, Respondent, and the two children are citizens of the United States, they were living legally in France on long-term visas.[5]

---

[5]It is of no significant that neither the parents nor the children are citizens of France, as citizenship has no bearing on a determination of a child's habitual residence. *Rydder v. Rydder*, 49 F.3d 369, 373 (8th Cir. 1995) (finding Poland was children's habitual residence, although no one in the family was a citizen of Poland).

A.A. and A.J.A. speak both French and English and were enrolled and French schools.  The family lived together in a house they rented, and the children had friends in their neighborhood and were in integrated into their community.  They participated sports and a number of other extracurricular activities.  During their time in France, the family did travel to visit family in the United States, Haiti, and Jamacia, but the family returned to France.  There was also evidence that the family received financial assistance for the children from the government of France.  Based on the totality of the circumstances, the Court finds that Petitioner has established by a preponderance of the evidence that at the time of their removal, A.A.'s and A.J.A.'s habitual residence was in France, not in the United States or any other country.  *See, e.g.*, *Cohen v. Cohen*, 858 F.3d 1150, 1154 (8th Cir. 2017) (finding the United States to be a child's habitual residence and reasoning that he had lived there for almost two years, attended school and speech-therapy classes, had friends and extended family, and his mother had obtained employment, purchased a vehicle, and rented an apartment there); *Guzzo v. Hansen*, No. 4:22-CV-15 PLC, 2022 WL 3081159, at *5 (E.D. Mo. Aug. 3, 2022), *aff'd,* No. 22-2972, 2023 WL 8433557 (8th Cir. Dec. 5, 2023) (finding Spain was the habitual residence of a child despite evidence that the child regularly visited the United States, maintained significant family relationships in the United States, and had stronger English than Spanish

14

skills; reasoning that the child had "lived in Spain for five years (or half of his life), spoke Spanish, and attended school, participated in extracurricular activities, socialized with friends, and had a pediatrician in Spain.").

In sum, the Court finds Petitioner has established all elements of his *prima facie* case by the preponderance of the evidence.  The burden thus shifts to Respondent to establish an affirmative defense to A.A.'s and A.J.A.'s prompt return to France.

### B.    Respondent's Affirmative Defenses

#### 1.    *Grave risk of harm*

In opposing removal, Respondent contends that returning A.A. and A.J.A. to France would expose them to a grave risk of physical or psychological harm.  More specifically, she argues returning the children would cause harm because: (1) Petitioner has psychologically abused and harshly disciplined the children in the past; (2) Petitioner does not have a stable living situation; (3) Petitioner berated and abused her in front of the children; and (4) Petitioner has anger management issues and a past history of domestic violence.

Article 13b of the Hague Convention "does not require return if a respondent establishes by 'clear and convincing evidence,' … that 'there is a grave risk that [the children's] return would expose the child[ren] to physical or psychological harm or

otherwise place the child[ren] in an intolerable situation.'" *Acosta v. Acosta*, 725 F.3d 868, 875 (8th Cir. 2013) (quoting Hague Convention art. 13b; 42 U.S.C. § 11603(e)(2)(A)). In other words, Respondent must show "that a grave risk is highly probable." *Rodriguez v. Molina*, 96 F.4th 1079, 183 (8th Cir. 2024) (quotation omitted).

The Eighth Circuit has recognized that a grave risk of harm may exist in cases involving serious abuse or neglect. *Acosta*, 725 F.3d at 875. In examining whether the defense applies, "[d]istrict courts must engage in a fact-intensive inquiry to determine whether the respondent has proved a grave risk of harm, which requires careful consideration of several factors, including the nature and frequency of the abuse and the likelihood of its recurrence." *Vasquez v. Colores*, 648 F.3d 648, 650 (8th Cir. 2011) (citing *Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir. 2003)). "[I]n order to apply the Article 13(b) exception, the court would need to cite specific evidence of potential harm to the individual children." *Silverman*, 338 F.3d at 900. "[T]he potential harm must be severe, and there must be a probability that the harm will materialize." *Guzzo*, 2022 WL 3081159, at *7 (quoting *Ermini v. Vittori*, 758 F.3d 153 (2d Cir. 2014) (internal quotation marks omitted)). *See also Babcock v. Babcock*, 503 F. Supp. 3d 862, 882 (S.D. Iowa 2020) (noting that "the harm must be

a great deal more than minimal" and that "[n]ot any harm will do nor may the level of risk of harm be low") (quoting *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000)).

In this case, Respondent testified that on one occasion, Petitioner shoved a melon into A.A.'s mouth, and that he has hit the children on their heads with a wooden spoon as discipline for eating with their mouths open.  Respondent offered no other evidence of physical abuse that Petitioner directed towards A.A. and A.J.A. While the Court credits Respondent's testimony regarding Petitioner's past conduct towards the children, it does not rise to the level of severe or serious physical abuse. The incident with the melon occurred on one occasion, and there is no evidence that A.A. suffered physical harm.  As for Petitioner disciplining the children with a spoon, Respondent presented no evidence as to how often Petitioner has hit the children with a wooden spoon, the force he has used, whether the blows inflicted physical injuries, the children's reactions to being hit with a spoon, and/or whether the children required medical attention.  The Court does not condone Petitioner's past conduct but finds that the corporal punishment described in this case is relatively minor and does not rise to a level of severity such that it presents a grave risk of harm. *See Rodriguez*, 96 F.4th at 1084 (affirming district court's finding that the grave-risk exception did not apply where there was evidence that the petitioner had on more than one occasion forcefully and repeatedly struck the child with a belt).

*See also Gil-Leyva v. Leslie*, 780 F. App'x 580, 590 (10th Cir. 2019) (finding evidence that father spanked one child once and the other child six times with an open hand leaving marks on bare bottom did not establish grave risk of harm); *Foster v. Foster*, 654 F. Supp. 2d 348, 361 (W.D. Pa. 2009) (finding spankings, name-calling and physical discipline were insufficient to establish a grave risk of harm to the child); *Jaet v. Siso*, No. 08-81232CIV, 2009 WL 35270, at *7 (S.D. Fla. Jan. 5, 2009) (no clear and convincing evidence that children would be exposed to grave risk of harm although father clearly had a temper and had engaged in corporal punishment including spanking with an open hand, pinching of the face and/or jaws, and grabbing a shoulder or arm to move a child); *Ngassa v. Mpafe*, 488 F. Supp. 2d 514, 520 (D. Md. 2007) (spanking the children with a rubber flip flop as form of discipline did not constitute a grave risk of physical harm).

Regarding allegations of psychological abuse directed at the children, Respondent presented evidence that Petitioner has a domineering parenting style, that he yells at the children and has insulted A.A. based on her appearance. Respondent testified that the children are scared of their father, but this testimony is uncorroborated.  Notably, the children did not testify, and there was no expert testimony regarding the effect Petitioner's conduct has had on the children.  The grave risk defense is a narrow exception, and the psychological abuse Respondent

describes here does not rise to a level of magnitude to amount to serious abuse. Respondent has not established by clear and convincing evidence that the children will face a grave risk of psychological harm based on Petitioner prior conduct towards the children. *See, e.g., Foster*, 654 F. Supp. 2d at 361 (although father was found to be domineering, excessively demanding, egocentric, lacking in sensitivity, and impatient, the respondent has failed to demonstrate grave risk of psychological harm).

At the hearing, Respondent proffered testimony regarding Petitioner's living situation and expressed concerns about where the children would live if they were returned to France. The fact that Petitioner has less income and currently lives with his neighbor is not relevant to the grave risk defense. *Cuellar v. Joyce*, 596 F.3d 505, 509 (9th Cir. 2010) (reversing district court's denial of return that was based, in part, on poverty noting that "the State Department took care to emphasize that grave risk doesn't 'encompass ... a home where money is in short supply, or where educational or other opportunities are more limited.' 51 Fed. Reg. 10494, 10510 (1986)."). At the hearing, Respondent also focused on the food Petitioner served the children, such as the fact that he served the children a particular smoothie for breakfast. The parties clearly disagree as to the appropriate food to feed the children, but this is hardly grounds for the Court to find the children would be at grave risk of neglect. It

19

appears that the food Petitioner feeds the children is nutritious, and there is no evidence Petitioner's preferred diet amounts to abuse or neglect. *Lieberman v. Tabachnik*, 625 F. Supp. 2d 1109, 1126 (D. Colo. 2008) (rejecting grave risk defense where mother testified that father only fed the children rice, beans, and tortillas).

Respondent also points to Petitioner's conduct towards her as evidence of his propensity to harm the children. She argues that she has been a victim of his aggression and abuse, which demonstrates he is capable of inflicting such abuse on the children. Courts have held that evidence of domestic abuse can establish that there is a grave risk of harm to the children if they are returned to the abusing spouse's custody, but the abuse must be sufficiently severe. *See Acosta*, 725 F.3d at 876.

Here, Respondent testified that Petitioner taunted and berated her, that he is prone to yelling, and has called her offensive names in front of the children. Respondent described one occasion when Petitioner became angry and aggressive, and he slapped Respondent's phone out of her hand, which resulted in her being struck across the face. The strike did not leave a mark, and Respondent did not need medical attention. Respondent submitted no other evidence of physical aggression by Petitioner towards her.

Cases in in which courts have applied the grave risk exception for domestic abuse involve significantly more physical abuse – either physical abuse that occurred over a long period of time or that involved more serious injuries. *See, e.g.*, *Acosta*, 725 F.3d at 876 (affirmed application of grave risk defense where father threatened and verbally abused the mother during the marriage; after she left, he chased her and her companions around an apartment with a knife and then battered the mother with his fists causing physical injuries that required medical attention); *Van De Sande v. Van De Sande*, 431 F.3d 567, 569 (7th Cir. 2005) (reversing district court's return order where there was evidence mother was frequently and seriously beaten, including choking, throwing her against a wall, and kicking her in the shins); *Walsh*, 221 F.3d at 219 (reversing order of return where father was emotionally abusive and had severely beaten the children's mother in their presence).

The Court finds the case here is more similar to *Whallon v. Lynn*, 230 F.3d 450 (1st Cir. 2000). In *Whallon*, the distict court considered evidence of a pattern of verbal abuse against the mother and a stepchild, as well as a pattern of physical abuse against the mother that included an altercation in which the father pushed the mother and threw a rock at her car. *Id.* at 453. The district court concluded this evidence was insufficient to establish a grave risk of harm to the child, which was affirmed on appeal. *Id.* at 453. Again, the Court does not condone Petitioner's conduct, but

evidence of yelling, name calling, and one incident of physical aggression that did not result in bodily injury is not enough to establish by clear and convincing evidence that the children will face grave risk of harm if they are returned to France. *Id.*

Finally, Respondent offered into evidence court documents from Broward County, Florida. The documents relate to two incidents of domestic abuse from 2015 and 2016 that involved Petitioner. Respondent testified that she has personal knowledge of both incidents. According to court records and Respondent's testimony, Petitioner has another daughter from prior marriage, and on December 9, 2015, while the family was living in Florida, he picked his daughter up from school and there was an incident where Petitioner yelled at the daughter and after she locked her herself in her room, Petitioner forced the door open, breaking the door and the frame. This was done in A.A.'s presence. As for the second incident, according to court documents and Respondent's testimony, on January 1, 2016, there was an altercation between Petitioner and his mother. The mother and son were arguing and screaming at each other, and Petitioner slapped his mother.

These incidents are almost ten years old and involve aggression that was directed at persons who are not before the Court. However, the incidents do demonstrate that Petitioner has difficulties controlling his temper, and he has engaged in threatening and aggressive behavior towards family members. That said,

the Court finds these two incidents are not of such a serious nature that they establish A.A. and A.J.A. would face grave risk of harm if they are returned to France. *Rodriguez*, 96 F.4th at 1084.

The Court has considered all credible evidence of Petitioner's conduct in this case, including the conduct that dates back to 2015, and finds it does not rise to a level of severity for the grave risk defense to apply.  The grave risk defense is a narrow exception to the right of return, and while Petitioner's conduct ranges from concerning to repugnant and is likely to be scrutinized and taken into account in any future custody disputes, evaluating the evidence of Petitioner's conduct in its totality, the Court concludes Respondent has failed to show by clear and convincing evidence that there is a grave risk that A.A.'s and A.J.A.'s return would expose the children to physical or psychological harm or otherwise place the child in an intolerable situation.  *Rodriguez*, 96 F.4th at 1084; *Acosta*, 725 F.3d at 876.  The grave risk defense does not apply in this case.

### 2.    *Objection of mature child*

Respondent has indicated in filings with the Court that A.A. objects to returning to France.  When a child has attained a sufficient degree of age and maturity, it is appropriate for a court to take the child's views into account. *Custodio*, 842 F.3d at 1089.  In fact, under certain circumstances, a child's objections "can be

the sole reason that a court refuses to order return[.]" *Id.* But in order to carry her burden on this defense, Respondent must establish by a preponderance of the evidence (1) that the child has "attained an age and degree of maturity at which it is appropriate to take account of its views" and (2) "that the child objects to being returned." *Id.* (quoting the Hague Convention, art. 13).

Respondent did not bring the children to the evidentiary hearing, and they have not otherwise offered testimony in this case. Furthermore, no expert witness, such as a counselor or child psychologist, testified as to the children's maturity, states of mind, behavior and/or thoughts regarding returning to France. Respondent has presented insufficient evidence from which the Court can conclude that the children are sufficiently mature and that they object to returning to France. The objection of mature child defense does not apply in this case.

## V. Conclusion

For the reasons stated above, the Court finds that Petitioner has established a *prima facie* case for return of A.A. and A.J.A. to France. The Court further finds that Respondent has not proven that there is an affirmative defense preventing the return.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner Alain Armand's Verified Complaint and Petition for Return of Child Under the Hague Convention is **GRANTED**.  [ECF No. 1]

A separate Order Directing Return of Minor Children to Country of Habitual Residence will accompany this Opinion, Memorandum and Order.

Dated this 30th  day of April, 2025.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE